**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**COCA-COLA BOTTLING CO., Indianapolis, Ind., Respondent.**

No. 14400.

United States Court of Appeals
Seventh Circuit.

June 23, 1964.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Washington, D. C., Arnold Ordman, General Counsel, Stephen B. Goldberg, Theodore J. Martineau, Attorneys, N.L.R.B., for petitioner.

John I. Bradshaw, Jr., Indianapolis, Ind., David M. Cook, Indianapolis, Ind., McHale, Cook & Welch, Indianapolis, Ind., of counsel, for respondent.

Before DUFFY, SCHNACKENBERG and KNOCH, Circuit Judges.

DUFFY, Circuit Judge.

This proceeding is here on petition of National Labor Relations Board (NLRB or Board) pursuant to Section 10(e) of the National Labor Relations Act (Act) for enforcement of its order dated June 13, 1963, which is reported at 142 N.L.R.B. No. 112.

The Board found respondent (Company) had violated Section 8(a) (2) of the Act by dominating and interfering with Coca-Cola Employees Association of Indianapolis. The Board also found the Company violated Section 8(a) (3) and (1) by discharging employee Dorman because of his activities on behalf of the Teamsters Union. In addition, the Board found the Company violated Section 8(a) (1) of the Act by interrogating employees about their union activities and threatening reprisals.

The issues in this case are the outgrowth of an organizing campaign waged at the Company's plant in Indianapolis in the summer and fall of 1962 by several labor organizations. These included Local 135, International Brotherhood of Teamsters, etc. (Teamsters); Retail Wholesale and Department Store Union, AFL–CIO, Local 1096 (Retail Wholesale Union); the Brewery and Soft Drink Workers, Local 110, etc. (Brewery Workers), and the Coca-Cola Employees Association of Indianapolis (Association).

Prior to July 23, 1962, the Retail Wholesale Union attempted to organize

what is known as the "Inside Unit" which included the production department, dock workers, shippers, loaders, and bottlers. On June 23, 1962, this Union filed a petition with the Regional Director of the Board for an election. This Union made no attempt to organize driver salesmen, cooler department employees and advertising employees of the Company who were customarily referred to as the "Outside Unit."

Prior to April 14, 1962, the Teamsters started an organizing effort among employees of the "Outside Unit" and on August 14, 1962, the Teamsters filed a petition with the Regional Director for an election. Also, about this time, the Brewery Workers started an organizing effort in both the "Inside Unit" and the "Outside Unit."

Coca-Cola Employees Association of Indianapolis was organized in the 1930's as a social club. It arranged picnics and parties, operated a credit agency, made charitable contributions and purchased flowers for deceased members.

After its organization in the 1930's, the Association continued in existence without much change in its makeup or purposes until the early part of 1947 when it was reorganized and converted into a labor organization. A new constitution was adopted. It conducted collective bargaining relations with the Company and a labor contract was entered into in 1948. This agreement was never renewed and was gradually ignored. Certainly by 1951 or 1952 the Association had ceased completely any activities as a labor organization. It did continue, as formerly, as a vehicle for an employees' loan fund, credit union, flower fund and charitable contributions.

From the 1930's until 1962, except for the brief interval beginning in 1947, all bargaining or handling of grievances between the Company and its employees had been on an individual or informal committee basis rather than on a collective basis.

In 1962, some of the employees, recalling the Association's previous experience in labor matters, felt that it would be desirable to reactivate the Association as a labor organization. They employed an attorney who had no connection with the Company. This attorney advised that for the Association to qualify as a labor organization, it would be necessary to make certain changes such as the elimination of all supervisory employees; also, a revision of the constitution, the election of new officers and other matters. A reorganization was undertaken, meetings were held and new officers were elected.

The Association did become a labor organization in August 1962 during a reorganization process which commenced on August 7 and was completed on August 22. During this period, all supervisory personnel withdrew from the Association, and the new officers were elected by secret ballot of the non-supervisory employees. Plans were formed for adopting a new constitution, proper collective bargaining requests, assessing and collecting dues, and performing other functions of a labor organization.

Since the Association became a labor organization in August 1962, there has been a complete separation from the old Association and there has been no domination, assistance or support of the new Association by the Company. Furthermore, there has been no supervisory or management participation, control or representation in the new Association.

On August 20, 1962, a representation hearing was held in the office of the Regional Director on the petition filed by the Retail Wholesale Union with respect to the "Inside Unit." Representatives of Retail Wholesale Union, the Brewery Workers, the Employees Association and the Company were present. A consent election agreement was entered into which specified an election should be held on September 17, 1962 under the auspices of the Regional Director. The employees of the "Inside Unit" were given the choice of voting for the Retail Wholesale Union, the Brewery Workers, the Association or No Union.

On August 24, 1962, a representation hearing was held with respect to the "Outside Unit." A consent election agreement was entered into providing for a representation election for the "Outside Unit" on the same day as the election for the "Inside Unit," although at a later hour. Again, four choices were given on the ballot. The "Outside Unit" could vote for the Teamsters, the Brewery Workers, the Association or No Union.

The consent elections were held following an intensive campaign by the competing labor organizations. The election for the "Inside Unit" resulted in a large majority for the Retail Wholesale Union which was thereafter certified by the Board.

The election of the "Outside Unit" resulted in no majority. A run-off election was scheduled for October 8, 1962 between the Teamsters and the Association. The run-off election was duly held and the Association received a majority of the votes cast. The Association has not, to this day, been certified as the bargaining unit of the "Outside Unit" because of objections filed by the Teamsters which have not been acted upon, and apparently are still pending before the Regional Director.

The original charge in the present proceeding was filed by the Teamsters on September 24, 1962 following the first election but before the run-off election, alleging a violation of Section 7 of the Act because of alleged adverse treatment of one employee, Fairel Davis, and threats to another employee, Everett Dorman. On September 27, 1962, an amended charge was filed alleging that Dorman and another employee, Roland Poindexter, had been discharged for union activities. (The charges with reference to Davis and Poindexter were subsequently abandoned.) There was nothing in either the original charge or the amended charge about any alleged domination, interference or support of the Association in violation of Section 8 (a) (2) of the Act, or of any other matters affecting the election campaign.

However, on October 15, 1962, about a week after the run-off election, a second amended charge was filed by the Teamsters in which, for the first time, reference was made to alleged "domination, interference and support" of the Association. Upon the basis of this charge, the General Counsel issued a much broader complaint which ultimately led to the Board's order herein.

The Board found that the Company dominated or interfered with the Association and contributed financial support to it, but there is no evidence to support this finding with respect to the period of time after the reorganization of the Association in mid-August 1962. For over ten years previous to August 1962, the Association was not and did not function as a labor organization. The Board does not state or even imply that the rank and file of the employees had any doubt whatsoever that the Association was to be completely and totally independent.

In Keystone Steel and Wire Co. v. N. L. R. B., 7 Cir., 155 F.2d 553, this Court was confronted with a factual situation quite similar to that in the case at bar. We there rejected the Board's finding that the new organization was the successor to the taint of the prior dominated organization.

In N. L. R. B. v. Duncan F. & M. Works, 7 Cir., 142 F.2d 594, this Court rejected the Board's finding that a newly organized union was the alter ego of its dominated predecessor, largely because of a short time interval between the two.

The Board claims the 1962 membership cards of the Association support its finding of domination. But these cards had been distributed prior to the reorganization of the Association, through the supervisors of the various departments, and annual fees of fifty cents were solicited. The fifty-cent annual dues were of long standing, but in any event, the payment of such dues had always been purely voluntary.

Inscription on the cards was devised by Holland, Secretary of the Company. He testified he adopted the inscription

from a Teamsters' card. The inscription was never used for any purpose. The cards were not returned to the Association or to the Company. We think these cards were of no significance and are no support for the Board's disputed finding.

A second point relied on by the Board for its "domination" finding is that the Association had, for many years, operated vending machines in the plant. The acquisition of these machines occurred a long period prior to any time that is relevant to this proceeding.

As to dues money, no dues have been collected by the new officers.

In N. L. R. B. v. Post Publishing Company, 7 Cir., 311 F.2d 565, 569, 100% of a union's revenue during the period involved, came from the operation of a cafeteria and certain vending machines, as permitted by management. We refused to hold there was even a violation of Section 8(a) (1) or (2), let alone "domination." We held that permitting the Union to retain proceeds from the cafeteria of $600 and $120 annually from the operation of the vending machines " * * * is a permissible form of friendly cooperation designed to foster and resulting in uninterrupted harmonious labor-management relations, and is not the form of 'support' designed to interfere with, restrain or coerce employees in the free exercise of their right to choose or change their bargaining representative." See also Hotpoint Co. v. N. L. R. B., 7 Cir., 289 F.2d 683, and Coppus Engineering Corp. v. N. L. R. B., 1 Cir., 240 F.2d 564.

■ The Board's order requiring the disestablishment of the Association should not be enforced.

As to the discharge of Everett E. Dorman, it is true that the Board's finding of fact as to him is based almost entirely on the unsupported testimony of Dorman. There is much in the record to demonstrate that his testimony was untrustworthy. To illustrate, during the morning of one day he solemnly told the president of the Company he was working strongly for the Association. In the afternoon of the same day, he assured Teamsters' officers of his faithful adherence to their cause. Even the Board's findings state of Dorman " * * * without any apparent rhyme or reason [he] incredibly disputed the authenticity of his own signature. * * * " Also, the Board found that Dorman "was inclined to view facts in retrospect from a perspective most favorable to his own case." This would seem to be polite language for the Board saying that it recognized time after time Dorman had resorted to falsehoods.

In many respects, Dorman's testimony was self-contradictory or inherently improbable. He showed a great willingness to testify to whatever facts he thought would injure the Company's case or improve his claim, without any regard to the truth.

At one time, Dorman denied signing a paper, contending his signature was a forgery. When the trial examiner did not swallow that one, he admitted the signature was his but made the preposterous claim that the paper was blank when he signed it and that the typewritten material above his signature was later added.

Dorman gave positive testimony as to the dates of certain occurrences when otherwise undisputed testimony showed the occurrences happened on an earlier date.

It is surprising that the Board would accept Dorman's version of hotly contested facts when there was no corroborating evidence to Dorman's statements. Time after time Dorman swore falsely to material matters. We cannot regard such testimony as substantial evidence.

■ We do not think there is substantial support for the Board's finding that Dorman was discharged. He was offered a position as assistant foreman and he had the mechanical skill required. He accepted the job but did not report for work for two days. He telephoned in to the Company identifying himself as the "assistant foreman." He claimed his

failure to work was due to an injury. He later testified that such a statement was false. He was spending part of the time when he was absent from work conferring with the Teamsters as to whether he should take the new job. He then refused to report for work in his new job, and quit.

We cannot enforce that part of the Board's order to offer Everett Dorman reinstatement to his former or substantially equivalent position and to compensate him for any loss of pay with interest.

We are not dealing with mere abstract rights but with an employment relationship. Even if Dorman had been discharged, it has long been held that the misconduct of an employee may disqualify him for the right of employment. For instance, a requirement of reinstatement was eliminated in the case of a striker engaged in acts of intimidation. N. L. R. B. v. Kelco Corp., 4 Cir., 193 F.2d 642.

Although physical misconduct is not present here, Dorman's misconduct exemplified by his pattern of falsification and deceit during his employment with the Company, climaxed by his false testimony at the hearing, surely disqualifies him from reinstatement or other employment rights. To force him upon the Company under such circumstances would bring about an impossible situation.

The last question to be considered is the Board's finding that there were "independent violations of Section 8(a) (1) of the Act." This is based on alleged interrogations of employees Dorman, Dallas McKinney and Charles Thomas by President Yuncker.

 In order to avoid further extending this opinion, we shall not discuss in detail the conversations relied on by the Board. We think they are insufficient to support the Board's findings. Merely as an illustration, we cite the talk with Thomas by President Yuncker in the first part of August. Yuncker asked Thomas if he had any knowledge about the "guys" trying to organize a labor union. Thomas was not asked about his own or other employee activities. Furthermore, Thomas was a member of the "Inside Unit" which had no connection with the Teamsters, nor is it the subject matter of this proceeding. Certainly Thomas was in no way intimidated as he became shop steward of the Retail Wholesale Unit.

We conclude the findings and order of the Board are not supported by substantial evidence and are contrary to law.

The petition of the Board for enforcement of its order dated June 13, 1963 is

Denied.