**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BIG THREE WELDING EQUIPMENT COMPANY, Respondent.**

**No. 21732.**

United States Court of Appeals Fifth Circuit.

April 21, 1966.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Dominick L. Manoli, Assoc. Gen. Counsel, N. L. R. B., Nancy M. Sherman, Atty., N. L. R. B., Arnold Ordman, Gen. Counsel, Washington, D. C., for appellant.

Charles R. Vickery, Jr., and Huggins, Vickery & McConnell, Houston, Tex., for appellee.

Before RIVES, WISDOM and GEWIN, Circuit Judges.

GEWIN, Circuit Judge:

The National Labor Relations Board seeks to enforce its order against re-spondent, Big Three Welding Equipment Company (Company), to cease and desist from "interfering with, restraining, or coercing employees in the exercise of their statutory rights" and, affirmatively, to offer reinstatement and restitution of back pay to those employees dismissed from their jobs because of union or concerted activity. The order of the Board was issued pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., upon a finding that the Company violated Section 8(a) (1) of the Act by intimidating employees engaged in efforts to organize, by means of unlawful threats, economic inducements, and interrogations; and Section 8(a) (1) and (3) by discharging employees Guy East, Ruble C. Gentry, Jr. and Johnnie Cecil Gripon for their union or concerted activities.

The questions presented are as follows: (1) Did the Board have sufficient evidence to find (a) the Company unlawfully threatened, induced and interrogated its employees to dissuade them from organizing; (b) the Company discharged the above named employees for their union and concerted activities; (c) employee East was not a "supervisor" as defined by Section 152(11) of the Act?[1] (2) Should employees Gentry and Gripon be reinstated with back pay in view of the contention that they were guilty of misconduct including thievery?[2]

---

1. § 152(11)

"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay-off, recall, promote, discharge, *assign*, reward, or discipline other employees, or responsibly to *direct* them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." (emphasis added)

2. The Trial Examiner found that these two employees had admittedly participated in pilferage but concluded that such conduct was not the reason for their discharge. The following is from the Trial Examiner's intermediate report:

"I find, on the basis of the record as a whole that Respondent, in fact, first learned of the pilferages in which Gentry and Gripon admittedly participated during the taking of testimony in the instant case."

Black's Law Dictionary (4th ed. 1951) defines "pilferage" as "some form of stealing." In Great National Lloyds v. Hall, 265 S.W.2d 875, 879 (1954) the Civil Court of Appeals of Texas stated:

"And we think the words 'theft,' 'larceny,' 'robbery' and 'pilferage' usually and ordinarily mean the fraudulent and wrongful taking of the property of another, * * * "

See also Vol. 32A, "Words and Phrases" (Perm. ed. 1956) p. 89.

The facts may be outlined as follows: Big Three Welding Equipment Company manufactures oxygen, acetylene, nitrogen and argon which it sells to industrial consumers. It has plants and related operations in various locales; however, the only facility involved in this litigation is the plant in Orange, Texas, where there were approximately 28 employees at the time of the alleged violations.

During the early part of October, 1962, the employees of the Orange operation began discussing among themselves the possibility of "going union" because of dissatisfaction with working conditions, wage scales and fringe benefits. The evidence shows that employees Gentry, Gripon and East were instrumental in arranging an employees' meeting in the middle of October, during which Gentry was elected "representative or spokesman.". Gentry and Gripon are brothers-in-law and often were closely associated in their activities. Following the meeting, a substantial number of employees [3] signed cards stating, "I agree to organize." [4] Soon thereafter, Company management became aware of the employees' activity and began responding to it.

Following a number of confrontations between local management and employee leaders, the President of the Company, Harry K. Smith, came to Orange to settle the matter. He heard complaints from each of the workers and promised numerous reforms, including wage increases, added insurance benefits, better working conditions, etc. The record reveals that there was a great deal of hostility on the part of management toward the unionization efforts.

Near the end of November, 1962, East was called to Houston and questioned concerning his union activities. Later that day he was discharged. During the months of December and January, 1963, there was renewed restlessness among the employees because of the failure of the Company to implement the promised reforms. Another employees' meeting was held during which Gentry was again elected "representative". In the middle of February, Gentry took further employee complaints to management, and both he and Gripon were fired the next day.

In March, approximately 70% of the employees at the plant signed authorization cards from the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL–CIO.[5] Smith soon reappeared and again interrogated employees concerning their activities. A poll was conducted by Butler, whom the Trial Examiner found to be Personnel Manager. Of the 14 employees polled, 3 voted for the union and 11 against it. The Board began an investigation, held a hearing, adopted the Trial Examiner's findings and conclusions as to the violations, and issued its order.

## I

■ In the circumstances and under the facts presented in this case this Court will accept the credibility findings of the Examiner [6] (as adopted by the Board). A reading of the record *compels* the conclusion that the Company violated Section 8(a) (1) of the Act by threatening, inducing and interrogating its employees in regard to union activities. Employees testified that on numerous occasions management threatened them with discharge, shut-down, demotion, and other reprisals if they continued unionizing efforts. Moreover, upon hearing of the union efforts at Orange, Mr. Smith readily agreed to grant a wide range of benefits—from wage increases to safer working conditions—to induce

3. Eventually 24 of the 28 according to Gentry.

4. These cards were provided by the employee leaders, not by a union.

5. The Trial Examiner found that the Boilermarkers are not involved in this litigation.

6. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Plant City Steel Corp., 331 F.2d 511 (5 Cir. 1964).

anti-union sentiment among the workers. Lastly, the record reveals that management interrogated employees concerning their union involvement almost constantly from the beginning of the labor dispute. No citation of authority is necessary to hold such actions violative of the Act. In fact, neither in brief nor upon oral argument does the Company vigorously contest that portion of the Board's finding.

## II

■■ We consider next the question of whether the Company violated Section 8(a) (1) and (3) of the Act by discharging employees East, Gentry and Gripon because of their union activities. The record clearly shows that these three employees were the leaders or "instigators" of the union movement at the Orange plant and that management recognized them as such. Since the examiner credited the employees' testimony as to statements allegedly made by management indicating they were being fired for union activity, we are left with no choice but to conclude the Board had ample evidence on which to base its finding to the same effect. The Company's claim that they

were discharged because of thievery, insolence and disloyalty was rightfully rejected by the Board because the evidence to that effect is overshadowed by evidence establishing the existence of a discriminatory motive on the part of the Company.[7] These findings of fact necessarily compel a conclusion that the Company violated Section 8(a) (1) and (3) as to Gentry and Gripon; however, if East was a "supervisor" as defined by Section 152(11), his discharge was not a violation of Section 8(a) (1) and (3), regardless of the motives here involved. Oil City Brass Works v. N. L. R. B. (5 Cir. 1966) 357 F.2d 466.

## III

■ The Company contends that, as a "dispatcher" of company trucks and drivers, East was a "supervisor" and could be discharged for union activity without violating the Section 8 provisions. In view of our decision in N. L. R. B. v. Charley Toppino and Sons, Inc., 332 F.2d 85 (5 Cir. 1964), the testimony given by East himself during the hearing makes it abundantly clear that he was a supervisor.[8] Practically all of the duties

7. The Trial Examiner rejected the following reasons advanced by the Company for terminating the employment of Gentry and Gripon:

"Stansbury asserted his reason for terminating Gentry as 'I suspicioned him of being a thief. He criticized the Company. He criticized me. He was unhappy with his pay, his hourly scale. He thought he was a privileged character. He faked his logs. And then he demanded a raise.' Stansbury asserted his reasons for terminating Gripon were: 'I suspicioned that he was a thief. He criticized the Company. He criticized me very vehemently. He thought he was a privileged character.'"

8. East testified as follows:
"Q. Were you responsibile for pushing Joe?
"A. Yes, sir, since I was his dispatcher.
"Q. Was it your responsibility to push him and get work out of him?
"A. To get him to work, yes sir.
* * * * *
"Q. Was that your responsibility to make people go to work?

"A. It was the dispatcher's job to get work out of them."
* * * * *
"Q. Were you the man who determined what route a man took?
"A. My trucks, yes."
* * * * *
"Q. You said a while ago you wanted to find out if Guy Jones was the boss or you were the boss, did you not?
"A. Since he routed that truck that one day, yes, sir, I did.
"Q. Was it determined you were the boss of Mr. Falgout?
"A. Yes, sir, of that one certain man, yes, sir."
* * * * *
"Q. Who decided that was the fastest way to get the work done? Did you ever have two drivers and you picked the one to take the bank truck?
"A. I imagine there were some times I had two drivers available and I picked the one to go.
"Q. Beg pardon?
"A. I imagine I had two drivers available at some times and I picked the one that would go.

of the dispatcher in Toppino had their equivalent or counterpart in the duties assigned to and performed by East.[9] In addition, East gave *orders* to the drivers concerning work to do when they were not driving the trucks, while the dis-

"Q. Was Joe Falgout the only one you had to get straightened out about who was the boss?

"A. Yes, sir."

\* \* \* \* \*

"Q. Sometimes did the trucks have to have two men on them instead of one?

"A. There was a time or two they did, when they went out to pick up a load of empty cylinders off the ground, if the truck didn't have a lift gate, which mine didn't. I put two men on."

\* \* \* \* \*

"Q. When you put on an extra man, who picked out the extra man?

"A. Like I said before, that went back to who was in the office at the time, or if everybody was in the office, I picked the man with the lowest time."

\* \* \* \* \*

"Q. Did you try to balance the overtime?

"A. Sure did."

\* \* \* \* \*

"Q. Did you ever have your truckdrivers paint cylinders?

"A. Yes, sir, I have."

\* \* \* \* \*

"Q. Did you ever have any of your truckdrivers clean up the office?

"A. Yes, sir."

\* \* \* \* \*

"Q. Did you determine whether the truckdrivers should pick up paper and clean up the yard or not?

"A. If they didn't have nothing else to do?"

\* \* \* \* \*

"Q. Are you the one that kept them busy?

"A. Yes, sir, that was my job, that is what I was paid for."

\* \* \* \* \*

"Q. Have you ever had the truckdrivers paint the wheels on the trucks?

"A. During the day, when there was nothing else to do."

\* \* \* \* \*

"Q. Did you ever assign anybody to load and unload a truck?

"A. Yes, sir."

\* \* \* \* \*

"Q. Who did you assign to load and unload the trucks?

"A. Anybody that was there during the time.

"Q. You mean any of your truckdrivers?

"A. Any of my truckdrivers."

\* \* \* \* \*

"Q. Did you ever reprimand any of your drivers about using the safety equipment down at duPont?

"A. Yes, sir, pretty near every day."

\* \* \* \* \*

"Q. They knew you were the boss and they knew they had to do what you told them to, didn't they?

"A. They did do it, no argument about it."

\* \* \* \* \*

"Q. Have you ever assigned your truckdrivers to cleaning up the oxygen dock?

"A. Yes, sir. Any time they wasn't busy during the day, no deliveries to make."

\* \* \* \* \*

"Q. Did you ever have your personnel clean up the carbide house?

"A. Yes, sir."

\* \* \* \* \*

"Q. Did you roust them out to get it [acetylene truck] unloaded?

"A. I'd get them out there.

"Q. How did you get them out there?

"A. Just tell them.

"Q. Did you have any trouble getting them to obey you?

"A. No, sir, just that one time."

\* \* \* \* \*

"Q. Now, did you ever get calls at night for the pump truck?

"A. Quite often."

\* \* \* \* \*

"Q. Did you ever receive calls where you called out people?

"A. Yes, sir."

\* \* \* \* \*

"Q. I said did you get any complaints from anyone, customers or your superior?

"A. I got a few complaints wanting to know where their stuff was, that he was late leaving or what?

"Q. Who did you (sic) the complaints from?

"A. Different customers."

9. We said in Toppino at 332 F.2d 86:
"\* \* \* Carmona admitted that he had effectively recommended an employee's raise of pay, had selected truck drivers to work overtime, and had given 'friendly advice' to truck drivers as to the work they should do when not driving, which advice was always heeded. There was also strong evidence that Carmona responsibly directed employees how to perform their duties. \* \* \*"

patcher in Toppino gave only "friendly advice."

## IV

While we affirm the Board's finding that the Company was motivated by anti-union sympathies when it fired Gentry and Gripon, we must further decide the question of whether the order directing their reinstatement should be enforced in view of the fact that both of them admitted pilferage of goods and equipment from the Company.

During the hearing, Gentry gave testimony as follows:

"Q. Did you ever give two gallons of paint to Bill Scherry?

"A. I handed it out the window to Rufus Gearon; not Bill Scherry."

\* \* \* \* \* \*

"Q. Were you stealing the paint or was it given to you?

"A. It wasn't mine—period."

\* \* \* \* \* \*

"Q. Do you know anything that happened on any of the paint other than these two you and Billy Scherry took out of there?

"A. I sure don't.

"Q. Who else was helping in that?

"A. I saw fifty gallons threw away.

"Q. Who was keeping lookout for you?

"A. Mr. Gearon.

"Q. The three of you set it up with a lookout to take it, did you not?

"A. Something like that. I had forgotten about it."

This testimony was substantiated by the statement of Gentry's accomplice, Rufus Gearen:

"Q. (By Mr. Vickery) All right, sir. Would you tell us what happened?

"A. Well, he told me he would like to take a couple of gallons of paint home."

\* \* \* \* \* \*

"Q. All right, sir. And what happened?

"A. And he didn't know how to get it out of the plant. So he figured he would go outside and I would drop it to him out the window, and that is what we done.

"Q. Did you actually drop two cans of Big Three paint out the window to Mr. Gentry?

"A. Yes, sir.

"Q. Did Mr. Gentry take this paint and put it in his automobile and take it off the premises?

"A. Yes, sir."

There was also further evidence of similar misconduct on the part of Gentry.

During the hearing Gripon testified as follows:

"Q. Did you ever take any paint out of there?

"A. Yes, sir. I carried a couple of partial gallons of paint home.

"Q. Where did you get the paint?

"A. From the Orange plant.

"Q. Well, where in the Orange plant?

"A. Well, off the paint rack.

"Q. Beg pardon?

"A. Off the paint rack.

"Q. Where is the paint rack?

"A. Over there where they paint the cylinders in the plant.

"Q. What kind of paint was it?

"A. I think it was about half a gallon of gray paint and about half a gallon of green paint.

"Q. What did you want with the gray paint?

"A. I wanted to paint the inside of my work shop and paint my boat trailer.

"Q. Did you ask Mr. Shannon about that?

"A. No, sir.

"Q. Did you tell Mr. McAfee you were going to take some paint home?

"A. No, sir.

"Q. Did you tell anybody else?

"A. No, sir.

"Q. Did you put that paint in your car?

"A. Yes, sir."

Further undisputed evidence of Gripon's pilferage was offered by Gearen:

"Q. Would you mind telling us just what happened?

"A. Well, I was trying to buy a second-hand or a new rig from the plant there, and it was a little bit more expensive than my friend wanted to pay for one, so Johnny come up to me and told me he had one he would sell me for forty dollars.

So I told him to bring it out to the plant, and I would take it over there and let the boy use it for a few days, and if he wanted it, he would pay him for it.

He told me he couldn't bring it to the plant because he got it from there."

\* \* \* \* \* \*

"Q. Did Mr. Gripon state to you in connection with this transaction how many acetylene rigs he had taken out of Big Three?

"A. He told me he had taken three of them out.

"Q. Did he say whether or not you ought to swipe one?

"A. Well, he said that that is the way he got his, I could go ahead and get mine like that too, wouldn't have to pay for it then."

\* \* \* \* \* \*

"Q. Will you tell us just what happened in connection with the anti-freeze?

"A. Well, I just seen Johnnie pick up a gallon and a quart can out of the oil room there, and take it out and lay it behind the manifold."

\* \* \* \* \* \*

"Q. Was he concealing it and hiding it as he walked?

"A. Looked like he was.

"Q. And did he conceal and hide it among the manifold?

"A. No, he just took it and set it back against the wall."

\* \* \* \* \*

"Q. Did you ever see Mr. Gripon take any coffee cups?

"A. Yes."

\* \* \* \* \* \*

"Q. Did Johnnie Gripon ask anybody if he could have those cups?

"A. No, he didn't."

The Board contends that such thievery does not constitute grounds for refusal to reinstate because it was minor in nature and was condoned by management. They rely on Shell Oil v. N. L. R. B., 196 F.2d 637 (5 Cir. 1952) where a union-active employee was discharged supposedly for pilfering gasoline from the company tank. We said in that case that since other employees, as well as management, were admittedly guilty of the same practice, it was one which was apparently well known and condoned by the company; therefore, it was not a sufficient reason for discharge. There is no indication that theft of the magnitude here evident was condoned in Shell. The items involved in the instant case are not insignificant. Moreover, as to Gripon and Gentry, condonation is not an issue in this litigation in view of the fact that the Trial Examiner found and we have affirmed the fact that they were discharged because of their union activity. As a matter of fact the Trial Examiner concluded that the Company was not aware of the pilferage in question until the hearing was conducted (see footnote 2). The Board also cites N. L. R. B. v. Anchor Rome Mills, 228 F.2d 775 (5 Cir. 1956), in which we stated that since the employer had initially refused to reinstate an employee on the false assertion that they had no vacancy for him, on review we rejected the employer's defense that the employee had been convicted of acts of violence during the labor dispute. In other words, we questioned whether the company's objection to reinstating the employee was genuine, even though it might have otherwise been sufficient.

In view of the overall conduct of Gentry and Gripon, including their admission of serious misconduct in pilfering the company's property, we conclude that the Company should not be required to reinstate them. As the Seventh Cir-

cuit said in N. L. R. B. v. Coca Cola Bottling, 333 F.2d 181 (7 Cir. 1964), "We are not dealing with abstract rights, but with an employment relationship." [10] Giving full consideration to all of the evidence in the record as a whole we are firmly convinced that the purposes and policies of the Act would not be effectuated by the reinstatement of these two employees with an admitted record of highly objectionable misconduct in a relatively small company where relationships are close and conduct of the type here involved is inevitably known to other employees as well as management. Not only would there be serious tension and ill will between the two employees and management, but, perhaps more important, reinstatement in such circumstances could well be an *invitation* to continue such misconduct on the part of the reinstated employees as well as others. Such distasteful misconduct is sufficient reason for refusing reinstatement. N. L. R. B. v. R. C. Can Co., 340 F.2d 433 (5 Cir. 1965); N. L. R. B. v. Coca Cola Bottling, supra; Iowa Beef Packers, Inc. v. N. L. R. B., 331 F.2d 176, 178 (8 Cir. 1964). See also, N. L. R. B. v. National Furniture Mfg. Co., 315 F.2d 280 (7 Cir. 1963); United Steel Workers of America, CIO v. N. L. R. B., 100 U.S.App.D.C. 170, 243 F.2d 593 (1956); N. L. R. B. v. Marshall Car Wheel & Foundry, 218 F.2d 409 (5 Cir. 1955).

We are fully aware of the holding in N. L. R. B. v. Burnup & Sims, 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964). In that case the discharge related to misconduct arising out of a protected activity, and while the employer may have

acted in good faith, it was shown that the alleged misconduct never did take place. In spite of motive and good faith on the part of the employer, the employee was not guilty of misconduct as a matter of fact. In the instant case the employees were guilty.

Accordingly, the Board's order will be enforced except as it relates to the offer of reinstatement and employment to East, Gentry and Gripon. As to such reemployment, enforcement is

Denied.

---

10. The following is from the opinion in the *Coca Cola* case:

"We are not dealing with mere abstract rights but with an employment relationship. Even if Dorman had been discharged, it has long been held that the misconduct of an employee may disqualify him for the right of employment. For instance, a requirement of reinstatement was eliminated in the case of a striker engaged in acts of intimidation. N. L. R. B. v. Kelco Corp., 4 Cir., 193 F.2d 642.

"Although physical misconduct is not present here, Dorman's misconduct exemplified by his pattern of falsification and deceit during his employment with the Company, climaxed by his false testimony at the hearing, surely disqualifies him from reinstatement or other employment rights. To force him upon the Company under such circumstances would bring about an impossible situation."