**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HENRY COLDER COMPANY, Respondent.**

**No. 16722.**

United States Court of Appeals Seventh Circuit.

Oct. 8, 1969.

---

6. The quoted pharse is used with our apologies to the late Fred Allen.

751

Arnold Ordman, Gen. Counsel, Domi-
nick L. Manoli, Associate Gen. Counsel,
Marcel Mallet-Prevost, Asst. Gen. Coun-

sel, Elliott, Moore, Jerome Weinstein, Laurence H. Silberman, Attys., N.L.R.B., Washington, D. C., for petitioner.

Russ R. Mueller, Walter S. Davis, Milwaukee, Wis., for respondent.

Before CASTLE, Chief Judge, KILEY, Circuit Judge, and GRANT, District Judge [1].

GRANT, District Judge.

This is a petition by the Labor Board pursuant to Section 10(e) of the Labor Management Relations Act, 61 Stat. 146 (1947), 29 U.S.C.A. § 160, for enforcement of an order issued against the respondent (Company) on February 24, 1967.[2] The Board found that the Company violated Sections 8(a) (1), 8(a) (2), 8(a) (3), and 8(a) (5), of the Act.

The Henry Colder Company is located in Milwaukee, Wisconsin where, during the time pertinent to this proceeding, it operated three stores which sold appliances, air conditioners, and television sets. Twenty-nine persons were employed in these stores as salesmen, office workers, and service and maintenance employees. The Retail Store Employees Local No. 444, Retail Clerks International, AFL–CIO (Retail Clerks) began organizing these employees in September of 1964. At about this same time, the Teamsters Union began organizing the truck drivers and helpers employed by the Company.

By October 3, 1964, the Company had knowledge of the Retail Clerk's organizational campaign. On October 7 the Teamsters and the Retail Clerks went on strike in protest against the Company's discharge of several drivers and helpers. Of the 29 employees in the unit which the Retail Clerks were seeking to organize, 10 either picketed or refused to cross the picket line. The strike ended the following weekend and by Monday, October 12, the discharged drivers and the striking employees were back on the job.

On October 8, 1964, the Retail Clerks wired the Company claiming that it represented a majority of the Company's employees, offered to have a neutral party check the authorization cards, and demanded recognition. On the preceding day the Retail Clerks, the Teamsters, and the Company had each filed a representation petition with the regional office of the Board. Conferences were held at the Board's offices on October 13 and October 19 in an attempt to reach a consent election agreement, but without success. The Clerk's Union, having received no response from the Company regarding its recognition demand, sent a second wire to the Company on October 13 repeating its assertion of majority representation and its demand for recognition.

In a letter to both the Retail Clerks and the Teamsters on October 19, the Company declined recognition "because of reports we have received from our employees with respect to threats made to employees who refused to sign union authorization cards, and misrepresentations made by solicitors of such authorization cards. * * *"

A second strike against the Company occurred on October 22, 1964, wherein both the Retail Clerks and the Teamsters participated. On October 26 the Company recognized the Teamsters as the representative of the truck drivers and helpers, and the strike ended on December 4, 1964.

As a result of the Company's actions during this time period, the Retail Clerks filed complaints with the Board charging the Company with violations of Sections 8(a) (1), 8(a) (2), 8(a) (3), and 8(a) (5) of the Act. After a rather extensive hearing, the Trial Examiner found that the Company was guilty of the violations charged by the Union and rendered his decision accordingly on November 19, 1965. After a supplemental decision by the Trial Examiner, the Board's decision of February 24, 1967, adopted the Trial Examiner's findings,

1. Of the United States District Court for the Northern District of Indiana, sitting by designation.

2. The Board's Decision and Order are reported at 163 NLRB No. 13.

conclusions and recommendations except for some modification of the Trial Examiner's recommended Order. The Board now seeks the enforcement of its Order.

### 8(a) (1) and 8(a) (3)

The Board found that the Company violated Section 8(a) (1) of the Act by threatening and coercively interrogating its employees by promising them benefits in order to undermine the Union, by attempting to induce them to bypass the Union, and by threatening them with reprisals for having engaged in protected activity.

Although it is a well established rule that interrogation of employees regarding union affairs is not necessarily a violation of the Act, N. L. R. B. v. Coca Cola Bottling Co., 333 F.2d 181 (7th Cir. 1964); N. L. R. B. v. Larry Faul Oldsmobile Co., Inc., 316 F.2d 595 (7th Cir. 1963), it is equally well recognized that a violation may be committed where the interrogation is either coercive of itself or coercive when viewed in light of all the surrounding company conduct. N. L. R. B. v. Thompson Ramo Woolridge, Inc., 305 F.2d 807 (7th Cir. 1962); N. L. R. B. v. Wagner Iron Works, 220 F.2d 126, 139 (7th Cir. 1955), cert. denied, 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956).

The October 6 interrogations by Department Manager Conn, in the presence of Walker Felker, the store manager, of employees Walters and Rosinski and the October 7 interrogations by Managers Raufman and Galow of employees Barwick and Brady, when viewed in light of the totality of the circumstances surrounding such events, were, we believe, such as would constitute a violation of Section 8(a) (1) of the Act. N. L. R. B. v. Merchants Police, Inc., 313 F.2d 310 (7th Cir. 1963); N. L. R. B. v. Sawyer Downtown Motors, Inc., 213 F.2d 514 (7th Cir. 1954). The same observation and conclusion is equally applicable to the Company's promises of benefits to certain employees which took various forms but included promises of promo-

tion, hospitalization, profit sharing plans, and better commission arrangements. N. L. R. B. v. Taitel, 261 F.2d 1 (7th Cir. 1958), cert. denied, 359 U.S. 944, 79 S.Ct. 725, 3 L.Ed.2d 677 (1959). For this reason we agree with the Board's finding that the Company violated Section 8(a) (1) of the Act.

The Board also found that the Company violated Section 8(a) (3) of the Act by discharging employee Norman Walters for his union activities and sympathies. Walters was active in the union organization drive, was a productive salesman, was offered a new position with an increased salary which he rejected and was not the youngest employee in terms of seniority at the time his employment was terminated on January 14, 1965. Such conduct provides substantial evidence in the record as a whole to support the Board's finding that Walters' employment was terminated because of his union activities and sympathies in violation of Section 8(a) (3) of the Act, rather than for the reasons advanced by the Company. Cf. N. L. R. B. v. Economy Food Center, Inc., 333 F.2d 468 (7th Cir. 1964); N. L. R. B. v. Marsh Supermarkets, Inc., 327 F.2d 109 (7th Cir. 1963), cert. denied, 377 U.S. 944, 84 S.Ct. 1351, 12 L.Ed.2d 307 (1964). The Board's Order with respect to these violations should be enforced.

### 8(a) (2) and 8(a) (5)

The Board further found that the Company violated Section 8(a) (2) of the Act by dominating and interfering with the formation and administration of the Colder Company Employees Association. The Board asserts that the Association was without question a "labor organization" as defined in Section 2(5) of the Act. The Company has not argued to the contrary in either its brief or at oral argument.

An initial issue which affects the Board's finding of both an 8(a) (2) and an 8(a) (5) violation is whether certain persons employed by the Company should be considered supervisors or employees

for collective bargaining purposes. Frank Meyer, Jerry Conn, and Howard Stengel were active in promoting and organizing the Colder Company Employees Association. These men exercised a certain degree of direction over the other employees in the Company's three stores which required the use of independent judgment on their part. Jerry Conn had the title of furniture manager and, in that capacity, authorized deviations from fixed prices on merchandise, authorized commissions to salesmen on those sales which did not satisfy the minimum set for the payment of commissions and interviewed prospective applicants for employment. All three of these men received a one percent override commission on sales made by other salesmen in their respective stores. Since the Board found that these men were supervisors as defined in the Act[3], it found a violation of Section 8(a) (2) on the basis of the well established principle that supervisory participation in the formulation and administration of a labor organization constitutes a violation of the Act. Powers Regulator Co. v. N. L. R. B., 355 F.2d 506 (7th Cir. 1966); Revere Copper & Brass, Inc. v. N. L. R. B., 324 F.2d 132 (7th Cir. 1963).

As this Court stated in N. L. R. B. v. Elliott Williams Co., Inc., 345 F.2d 460, 463 (7th Cir. 1965) the determination of who is a supervisor "is a practical matter and one of fact in which the Board, in the exercise of its primary function as fact finder, must be permitted 'a large measure of informed discretion.'" See also N. L. R. B. v. American Oil Co., 387 F.2d 786 (7th Cir. 1967).

There is substantial evidence in the record as a whole to support the Board's finding as to the supervisory status of these persons and said finding shall not be disturbed. The same is equally true as to the Board's finding that Richard Mueller and Dorothy Gallow were also supervisors and consequently they were properly excluded from the bargaining unit. We therefore agree with the Board's finding that the Company violated Section 8(a) (2) of the Act. Its Order with respect to this Section 8(a) (2) violation should likewise be enforced.

■ The Board also found that the Company violated Section 8(a) (5) of the Act by refusing to bargain with the Union after it informed the Company that a majority of the employees in the unit had signed authorization cards designating the Retail Clerks as their bargaining agent. The Union demanded recognition and offered to have a neutral party check the authorization cards signed by the employees.

The Company's contention that the use of authorization cards designating a union as the employees' bargaining representative is an inherently unreliable method of providing a valid alternate means of determining majority status has been refuted by the Supreme Court in the recent case of N. L. R. B. v. Gissel Packing Co. Inc., 395 U.S. 575, 89 S. Ct. 1918, 23 L.Ed.2d 547 (1969).

The Company further contends that it did not violate Section 8(a) (5) of the Act because the Union did not possess its claimed majority status. The Board found that when the Company rejected the Retail Clerks' demand for recognition, 21 of the 29 employees in the unit had designated the Retail Clerks as their bargaining representative. The Company has attempted to attack the majority status of the Union by arguing that the Board excluded five persons from the unit because it erroneously determined that they were supervisors, that the authorization cards were obtained by misrepresentation of fact and threats and that the use of "joint-union" authorization cards caused the cards to be rendered invalid.

3. Section 2(11) of the Act. This Section is to be read in the disjunctive. Possession of any one of the enumerated powers is sufficient to establish supervisory status. N.L.R.B. v. Process Corp., 412 F.2d 215 (7th Cir. 1969); Jas. H. Matthews & Co. v. N.L.R.B., 354 F.2d 432 (8th Cir. 1965), cert. denied 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966).

The Company submits that 18 persons, rather than 15, were required to establish a majority because the Board erred in excluding 5 persons from the unit on the ground that it found said persons to be supervisors within the meaning of the Act. This argument is rejected as it relates to the 8(a) (5) violation for the same reasons as discussed above in dealing with the 8(a) (2) violation. Furthermore, even if the majority required 18 rather than 15 signatures, it would not of itself have changed the result since the Board found that 21 employees had signed the authorization cards. We agree with the Board, however, that the unit consists of 29 employees and not 34 as argued by the Company.

The Company also contends that nine of the authorization cards are invalid because they were obtained by misrepresentation of fact and threats. N. L. R. B. v. Dan Howard Mfg. Co., 390 F.2d 304 (7th Cir. 1968). We believe that the Union's actions were not of such a nature as to constitute misrepresentation of fact or threats and that the Board was correct in concluding that these employees freely designated the Retail Clerks as their collective bargaining representative. As the Supreme Court said in N. L. R. B. v. Gissel, *supra*:

> employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature. Id. 395 U.S. at 606, 89 S.Ct. at 1936.

Finally the Company argues that "joint-union" authorization cards designating both the Retail Clerks and the Teamsters Unions to represent the employees were utilized and that such cards are invalid with the result that they can not be counted in establishing the Retail Clerks' majority status. The Company can positively point to only three employees who signed the "joint-union" authorization cards. Any argument that the other employees also signed the joint card is based only on speculation and presumption and has no factual basis in the record. Since the authorization cards indicated that 21 of 29 employees desired the Retail Clerks as their bargaining representative, even if these three cards were ruled invalid, it would not destroy the majority status of the Union. This is not to say, however, that the use of such joint cards would render such cards necessarily invalid.

It is clear that the Retail Clerks Union was interested only in representing the Company's inside employees— the salesmen, service and maintenance people and office workers. The Teamsters on the other hand were interested only in representing the truck drivers and helpers. These were not rival unions who were attempting to organize and represent the same employees. The evidence in the record indicates that the real purpose of utilizing the joint cards was not to obtain a joint contract with the Company, but rather to obtain the earliest possible recognition of both unions by use of the maximum economic pressure available to them. All of the solicitations for dual cards among the employees of this unit were conducted by unit members and business agents of the Clerks' Union and not by members of the Teamsters.

We agree with the Trial Examiners' conclusion which was subsequently adopted by the Board "that such dual authorization cards as may have been signed by employees of the involved unit constituted joint and several authorizations and had no effect in reducing the heretofore found majority card count in favor of Local No. 444."

 Absent exceptional circumstances, see N. L. R. B. v. S. S. Logan Packing Co., 386 F.2d 562 (4th Cir. 1967); J. C. Penney Co., Inc., v. N. L. R. B., 384 F.2d 479 (10th Cir. 1967); United Steelworkers of America v. N. L. R. B., 126 U.S.App.D.C. 215, 376 F.2d 770 (1967), *Gissel*, supra, indicates that a

bargaining order is an appropriate and authorized remedy:

> where an employer rejects a (valid) card majority while at the same time committing unfair labor practices that tend to undermine the union's majority and make a fair election an unlikely possibility * * * *Gissel*, supra, 395 U.S. at 579, 89 S.Ct. at 1922.

Although the Board found, on substantial evidence, that the Union did possess a valid card majority and that the Company thereafter committed various unfair labor practices, no finding was made as to whether or not these unfair labor practices made a fair election an unlikely possibility. Instead, the Board phrased its findings in terms of the pre-*Gissel* standard—the employer's good-or-bad-faith doubts concerning the Union's card majority.

The Board's bargaining Order should not, therefore, be enforced. The proper course is to remand for proper findings in terms of the *Gissel* standard. *Gissel*, supra at 616, 89 S.Ct. 1918.

The Board's Order will be enforced in part and remanded in part.