NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

COMMONWEALTH FOODS, INC,
(WEST END) d/b/a Farm Fresh
Supermarkets, Respondent.

No. 73-2026.

United States Court of Appeals,
Fourth Circuit.

Argued June 3, 1974.

Decided Nov. 6, 1974.

David A. Fleischer, Atty., N. L. R. B.
(Peter G. Nash, Gen. Counsel, John S.
Irving, Deputy Gen. Counsel, Patrick
Hardin, Associate Gen. Counsel, Elliott
Moore, Deputy Associate Gen. Counsel,
and William H. DuRoss, III, Atty., N. L.
R. B., on brief), for petitioner.

Richard R. Rock, Arkansas City, Kan.,
and H. Lee Kanter, Norfolk, Va. (Rock
& Smith, Arkansas City, Kan., Kanter &
Kanter, Norfolk, Va., on brief), for re-
spondent.

Before BUTZNER, RUSSELL and
WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

This application for enforcement of a
National Labor Relations Board (Board)
order is brought pursuant to § 10(e) of
the National Labor Relations Act (Act),
29 U.S.C. § 160(e). Commonwealth
Foods (the Company) was found by the
Board to have interfered with and
coerced employees at one of its stores in
violation of § 8(a)(1) and to have dis-
charged three employees·because of un-
ion activities in violation of § 8(a)(3)
and (1) of the Act. 29 U.S.C. §
158(a)(1) and (3).

The Company tells us in oral argument that it did not contest the § 8(a)(1) violations before the Board. It makes no issue of them in its brief here. In all events, it is apparent that the § 8(a)(1) findings of the Board are supported by substantial evidence, and enforcement of the Board's order as to them is granted.

The Company makes an issue of the Board's refusal to grant a motion asking for the particulars of certain conversations. In view of the fact that we have had pointed out to us no prejudice by the refusal and that most of the inquiries are directed to § 8(a)(1) violations which are uncontested here, and also considering our disposition of the § 8(a)(3) charges, we do not find it necessary to pass on this question. Also unnecessary to decide is the Company's claim that the Board's decision is based partly on work product.

For the reasons hereafter stated, however, we decline to enforce that part of the Board's order requiring reinstatement of the three employees, and remand for further proceedings by the Board.

The Company is a small retail grocery chain, having eleven stores and approximately 1,000 employees, with principal offices located in Norfolk, Virginia. Three of the stores are located in Richmond. This dispute arose at one of the Richmond stores (No. 474), which had between 50 and 60 employees at the time.

The Company had a longstanding policy of conducting routine polygraph tests periodically on various employees of its stores. Prospective employees, in their job applications, must agree to submit to these tests as a condition of employment, and the Company additionally has posted and passed out statements to employees regarding its polygraph policy. Since 1969, the Company had utilized the New York security control consultant firm of Lincoln Zonn, Inc. (Zonn) to conduct the polygraph tests. Of employees given the test from September, 1969 through May, 1972, Zonn rated 516 employees as "recommended" and 83 as "not recommended."

Store No. 474 and another Richmond store were visited by Zonn the same week. The general manager testified, without contradiction, that No. 474 was scheduled because of shortages occurring in September and October. On December 16, 1971, a Zonn polygraph examiner, who treated the visit as routine, arrived at Store 474 and identified himself to the store manager. The examiner testified that he had not been pre-instructed with regard to who was to be examined, nor of any special problem area. He explained to Baber, the store manager, that the normal procedure was to interview the store manager, assistant manager, and employees who handle money. The manager, who had no explicit advance warning of the visit, likewise had not been pre-instructed as to who should be tested, so he chose himself, the assistant store manager, two employees who handled money in the office, three principal cashiers, an employee under consideration for assistant head cashier, one who had had some recent shortages, and one because of a problem from a previous polygraph. These employees were tested on December 16 and 17, 1971. The examiner testified that the polygraph tests were conducted in a normal fashion, and he dictated his confidential report and recommendation immediately after each interview.

The results of the tests, which were mailed from Zonn's New York office and received by the Company's general manager, Walters, in his Norfolk office on December 29, 1971, were quite alarming, as nine of the ten employees tested at Store 474 were "not recommended," the only exception being the store manager. Walters called Zonn and asked him to re-evaluate the tests because he "couldn't close the store down." Lincoln Zonn, president of Zonn Company, did the re-evaluation himself on January 1, 1972; he called Walters and told him he had changed some of the recommendations but was not very happy about it

because the reports appeared to be accurate. After re-evaluation, four employees remained in the "not recommended" category. The examiner who administered the test was not consulted concerning the re-evaluations but testified that he did not believe any of the employees originally rated "not recommended" should be retained. Of the five employees whose recommendations were changed and were retained, at least two had joined the union.

A few days later, Walters called the store manager and told him to separate two employees immediately, one the next week, and one the week after that. The staggered discharges were done to avoid disruptions and embarrassment, and to allow time for replacements. All four were terminated but one, who Walters ordered kept on advice of counsel after receiving a letter from the organizing union, dated January 24, 1972, advising him that she and six other employees were active in the organizing campaign. The other three were also listed in the letter from the union but had already been discharged when the letter was received.

An issue in this case is whether the Company had knowledge of union activity at Store 474 by the three employees involved here, in order to justify the Board's inference that their discharge was for protected pro-union activity. NLRB v. Lexington Chair Co., 361 F.2d 283 (4th Cir. 1966).

■ As to one of the discharged employees, the evidence is ample to sustain knowledge by the Company of her pro-union activities. For example, meetings were held in her home, at least one of which was attended by an employee variously described as a management trainee or assistant manager, who testified he pretended pro-union sentiments in order to gain information about union activity. Evidence that the Company knew of the union activities of the other two is much more slender, but in view of a statement attributed to the manager and denied by him (but credited by the Board), implying that the firings were connected with the union campaign, we are of opinion there is substantial evidence that the Company knew of the union activity of the three employees at the time of their discharges.

■ Had the employees been discharged for the ordinary reasons, tardiness, infraction of minor rules, etc., then our problem would be at an end, for the rule in such cases is that if the desire to stifle pro-union activity contributes to the discharge, it is discriminatory. NLRB v. Hanes Hosiery Division, Hanes Corp., 413 F.2d 457, 458 (4th Cir. 1969). Reinstatement may be granted.

But, in this case, a different rule obtains. The polygraph examiner took substantial time with each interview, variously described as an hour to an hour and three-quarters. He conducted a detailed oral interview prior to the actual polygraph test. It is true that various employees testified that the examiner suggested to each of them that nearly everyone steals something, however small, from his employer, and suggested upper limits on the amounts taken. But it is not true that the answers were suggested by the examiner. The three employees in question wrote and signed statements in their own hand admitting various thefts from their employer and similar violations of company rules. There is no finding that the thefts by these employees had been known and condoned until the union campaign came along so that the polygraph test could be considered a mere sham and pretext. Two of the employees had been warned about shortages just prior to the polygraph test. Two of the three employees involved had an indication on the polygraph that they did not tell the truth about the maximum amount taken from the Company, despite having had the maximum amounts fixed by the prior interview; the third gave a written statement but was not tested on the polygraph because of her age of sixteen.

The employees involved testified. By their testimony they sought to considerably qualify their written statements. The Board did not determine whether

the written statements were true or not true, but decided that, since it found the polygraph tests to have been related to the union campaign, the discharges were not justified. The obvious conclusion of the Board was that reinstatement was mandated although the employees involved may have been stealing or engaged in like pilferage as indicated by their statements.

We do not agree with the Board in its conclusion, and instead follow the Fifth Circuit in its opinion in NLRB v. Big Three Welding Equipment Co., 359 F.2d 77 (5th Cir. 1966). In that case, on facts quite similar to the one at hand, there was evidence two employees had been engaged in stealing from their employer. The Board found that the theft was not known by the employer until the hearing, and although it found the employees had been engaged in the theft ordered them reinstated. The court declined to enforce the reinstatement order and decided that national labor policy does not necessarily require the reinstatement of an employee engaged in theft although the record may have substantial evidence from which the Board may have found the discharges due to protected union activity. As here, condonation of their conduct was not an issue.

The court stated, we agree, and apply the reasoning here:

" 'We are not dealing with abstract rights, but with an employment relationship.' [Footnote reference omitted] Giving full consideration to all of the evidence in the record as a whole we are firmly convinced that the purposes and policies of the Act would not be effectuated by the reinstatement of these two employees with an admitted record of highly objectionable misconduct in a relatively small company where relationships are close and conduct of the type here involved is inevitably known to other employees as well as management. Not only would there be serious tension and ill will between the two employees and management, but, perhaps more important, reinstatement in such circumstances could well be an *invitation* to continue such misconduct on the part of the reinstated employees as well as others. Such distasteful misconduct is sufficient reason for refusing reinstatement." 359 F.2d 77, 84. ˙

■ *Big Three Welding Equipment Company* differs from our case only that in that case there was a finding of fact by the Board that the employees had been engaged in theft. The Board has made no such finding here, and we believe a finding by the Board as to this matter would be more appropriate than a finding by us.

We remand to the Board to inquire into the truth of the written statements made by the three employees. If the statements are essentially true, or understate the truth, then the employees should not be reinstated.

Enforcement granted in part; denied in part; and remanded.