**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BRAKE PARTS COMPANY, Respondent.**

**No. 18532.**

United States Court of Appeals, Seventh Circuit.

June 24, 1971.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Stanley R. Zirkin, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Elliott Moore, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

James Allan Smith, Smith, Currie & Hancock, Atlanta, Ga., for Brake Parts Co.

Before MAJOR, Senior Circuit Judge, and CUMMINGS and STEVENS, Circuit Judges.

MAJOR, Senior Circuit Judge.

This case is here on application of the National Labor Relations Board (Board) pursuant to Section 10(e) of the National Labor Relations Act as amended, 29 U.S.C.A. Sec. 151 et seq. (the Act), for enforcement of its order against respondent, Brake Parts Company (the company or employer), issued August 28, 1969. The Board's decision and order are reported at 178 NLRB No. 43. Respondent requests that enforcement be denied.

The company, with a plant in McHenry, Illinois, is engaged in the manufac-

ture of automotive replacement parts and is the wholly owned subsidiary of Echlin Manufacturing Company, a Connecticut corporation. At the time involved in this controversy, the company had about 160 employees who worked on shifts 1, 2 and 3. The last was the night shift, on which some 18 or 20 persons were generally employed.

United Automobile Workers of America, AFL–CIO (the union) filed a petition for a representation election on May 8, 1968, in which the company acquiesced. Thereupon, the parties entered into a stipulation for certification upon consent election which was approved by the regional director on May 24, 1968. The order of approval provided that the following persons where entitled to vote, "All production and maintenance employees at the Employer's McHenry Illinois Plant, excluding office clerical employees, professional employees, guards, and supervisors as defined in the Act." On June 20, 1968, a charge was filed with the Board by the union, on which the Board's complaint issued July 31, 1968. It charged the company with violating the Act in some twenty instances.

The Board-supervised election was conducted on June 21, 1968, with the result that a majority of the employees rejected the union. Of the unchallenged ballots, 100 votes were cast against the union and 60 for it. The union filed timely objection to conduct affecting the results of the election, alleging many of the unfair labor practices which had been alleged in the original complaint. Hearing on such objections was consolidated with that in the instant unfair labor practice case. The trial examiner refused to set aside the election, which refusal was approved by the Board.

The Board on brief states the contested issues:

"1. Whether substantial evidence on the record as a whole supports the Board's finding that the Company interfered with, coerced and restrained its employees in the exercise of their Section 7 rights, in violation of Section 8(a) (1) of the Act.

"2. Whether substantial evidence on the record as a whole supports the Board's finding that the Company discriminatorily discharged employee Willis Butcher, in violation of Section 8 (a) (3) and (1) of the Act.

"3. Whether substantial evidence on the record as a whole supports the Board's finding that the Company discriminatorily rejected Sharon Hosch's application for employment because the Union had filed charges on her behalf, in violation of Section 8(a) (1), (3) and (4) of the Act."

The Board's issue No. 1 as to whether the company "interfered with, coerced and restrained its employees" is dependent almost entirely upon the subsidiary issue as to whether Harold Wardell, an employee on the night shift, was a supervisor within the meaning of Section 2 (11) of the Act, whether the company was responsible for his statements and conduct, and whether Caruk, the company's personnel manager, interrogated employee Erickson, in violation of Section 8(a) (1) of the Act. The trial examiner decided these issues adversely to the company, and the Board approved.

As to the Board's issue No. 2, the trial examiner found that the company did not discriminatorily discharge employee Butcher. The Board by a 2 to 1 decision rejected the finding of the examiner and found to the contrary.

With respect to the Board's issue No. 3, both the trial examiner and the Board concluded that the company violated Section 8(a) (1), (3), and (4) of the Act by not re-employing Sharon Hosch.

As a prelude to our discussion of the issues for decision, we think it is of some relevancy to describe briefly the precautionary measures which the company employed to assure compliance with the law by all authorized to speak for management and to give recognition to the rights of the employees.

Regular periodic meetings were held which were attended by all of the company's supervisors. During the union campaign a series of special meetings

were held with the supervisors. At those meetings the supervisors were informed of the company's position with regard to the union and what their behaviour should be during the campaign. The company's labor attorney attended the meetings and pointed out what actions could be legally taken as well as those which were prohibited during the campaign. Additionally, a brochure containing 10 to 12 pages of instructions regarding lawful and unlawful actions during the union campaign was issued to each of the supervisors at a special meeting. The contents of the brochure were discussed with and explained to the supervisors.

On May 2, 1968, Donald P. Miller, vice president of the company, read to three different groups of employees a statement which set forth the reasons for the company's opposition to the union and outlined in detail the legal rights of the company and its employees. This letter was prepared with the aid of a lawyer versed in labor law, and was read and discussed at a meeting of the supervisors before it was read to the employees. This letter was charged to constitute an unfair labor practice, but this charge was denied by the trial examiner, which denial was approved by the Board.

On June 7, 1968, the company sent to its employees a letter which again recited reasons why it thought the employees would be better off without a union. The union in its objections to the election also charged that this letter was an unfair labor practice. This charge was denied by the trial examiner, which denial was approved by the Board.

The company was charged with promising economic benefits to its employees as an inducement for them to reject the union. The only support for this charge was the testimony of Dorothy Hanson who testified as to a conversation with Frederic Mancheski, president of respondent's parent corporation, and Miller, its vice president. As the examiner points out, Miller refused to talk to her about the subject, explaining that his remarks might be construed to be an unfair labor practice. The examiner re-jected the testimony of Hanson as insufficient, which finding was approved by the Board.

We now consider the issue as to whether Harold Wardell was a company supervisor and, if so, whether it was responsible for his conduct. The examiner found against the company on this issue, which finding was approved by the Board. Section 2(11) of the Act (29 U.S.C.A. Sec. 152(11)) provides:

"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

The Board states, "This section must be read in the disjunctive; possession of any one of the enumerated powers establishes supervisory status." The Board, however, like the trial examiner, failed to point out which of the enumerated powers was possessed by Wardell to establish his supervisory status.

We do not take issue with and, therefore, need not cite or discuss numerous cases called to our attention by the Board wherein it has been held that the Board has the primary function as a fact finder in making the determination under discussion and that its determination is to be accepted if it has "warrant in the record" and a reasonable basis in law.

Whether there is such warrant in the record is our problem. The trial examiner on another phase of the case stated in a footnote, "Although Wardell is a supervisor within the meaning of the Act, he was not generally treated as a part of management. He was paid on an hourly basis, unlike the foremen and other recognized supervisors, and did not attend the meetings of the supervisors."

It can be added that he punched the clock when he came to work and when he departed, as did all other employees.

We take the findings on this issue as stated in the Board's brief. Employees in the rubber trim department considered Wardell, group leader and set-up man in the department, their immediate supervisor.[1] Although he worked in dungarees, was paid on an hourly basis, and punched a timeclock, his work differed significantly from the other employees in the rubber trim department. He had his own desk, assigned employees to machines other than those which they normally operated when the machines broke down or when the production schedule so required, and directed employees to fabricate certain automotive parts to meet the production schedule.

Wardell also exercised supervisory authority over the working hours of employees. Thus, on one occasion employee Hanson was given permission by Wardell to leave the plant upon reporting that she felt ill.[2] On another occasion, Hocin and two other employees were let off work early by Wardell on a particularly hot day.[3]

Wardell was responsible for preparing production reports for the company and kept attendance records as well, although he was not specifically required to perform this latter task. He was also responsible for rating the employees' work to determine their qualifications for the company's production bonus. He filled out forms rating the employee's job performance in a number of areas as "normal," "above normal" or "below normal," and points added to the production record as a result were used in determining an employee's bonus. On two occasions, he showed employee Hocin the scores he had given her on the questionnaire and on another occasion he told employee Hanson not to expect a raise, because of her performance. His evaluations were turned over to Henderlong, supervisor of the company's rubber area, for final approval.

Henderlong testified that Wardell functioned as a group leader and set-up man in the rubber trim department. He testified that Wardell worked under his supervision and that Wardell did not have the authority to hire, fire, transfer employees from one department to another, suspend, lay off or recall, promote or demote, reward or discipline employees, adjust their grievances, or effectively recommend such actions.

He testified that Wardell could assign employees to different machines in a limited area. Explaining this testimony, Henderlong stated that the female employees normally have a particular machine to which they are assigned. If one of these machines is not operating on a particular day because it is either broken down or because production is not required on that machine, Wardell could move an employee to a different machine. If the changed assignment resulted from an employee's regular machine being inoperative, Wardell's assignment was based solely upon which other machines were in working condition. If, on the other hand, the changed assignment was necessitated because production was not required on a particular machine, Wardell's assignment would be wholly based upon "what production control schedules."

Henderlong further testified that Wardell initially graded certain aspects of the performance of the employees with whom he worked, prior to the regularly scheduled periodic reviews of employees conducted by Henderlong. In doing this, Wardell filled out a sheet of paper containing a number of questions, and checked whether the employee's performance was normal, above normal or below normal. Approximately nine questions were on this sheet, and the questions re-

---

1. Two witnesses, Jeanne Hocin and Dorothy Hanson, testified that they considered Wardell their immediate supervisor.

2. A single witness, Dorothy Hanson, testified that on one occasion she was sick and Wardell told her to go home.

3. Hocin testified that Wardell permitted her and two other girls to leave their work early because of the heat. The other girls did not testify.

lated to such areas as attendance and neatness. After the sheet was turned over to Henderlong, he independently evaluated each employee himself and consolidated the result with the employee's production efficiency report. Henderlong specifically stated that he changed the grades whenever he disagreed with them. No points were ever subtracted from the employee's production efficiency record as a result of the questionnaire initially completed by Wardell and independently evaluated by Henderlong.

■ Viewing the situation as a whole, we are compelled to disagree with the examiner's finding, approved by the Board, that Wardell was a supervisor within the terms of the Act and that the company was responsible for his unauthorized acts and statements. As previously noted, the examiner found that Wardell was a supervisor but also found that he was not "generally treated as a part of management." It seems contradictory to say that an employee is a supervisor authorized to represent the company and at the same time to say that he is not a part of management. The minor incidents relied upon to support the finding that Wardell was a supervisor, as well as inferences drawn therefrom, become insignificant when weighed with factors about which there is no dispute. We have previously shown the scrupulous care exercised by the company in the instructions given to its supervisors as to their rights and obligations in connection with the effort to organize the union. Wardell was not invited to these meetings and made no attempt to attend. Also as previously noted, all supervisors were furnished a brochure which outlined their rights and obligations. No such brochure was furnished to Wardell. Surely under this showing there is no reasonable basis for the thought that the company considered Wardell a supervisor authorized to act for management, and it is plainly inferable that Wardell so recognized. Moreover, Wardell along with his fellow employees, without challenge by the union or otherwise, voted in the election. This constituted a recognition by all parties, including Wardell, that he was not a supervisor or a part of management.

It is also pertinent to note that a number of female employees who worked on the same shift with Wardell and Willis Butcher testified as to numerous complaints they made about Butcher on account of his inefficient work and gross misconduct toward them personally. No such complaints were made to Wardell, but they were made to foreman Neely or Knoth, the plant manager. Thus, a strong inference arises that they did not recognize Wardell as having any authority over Butcher or them; otherwise, their complaints would have been made to him.

The Board cites two cases, both by this court, in support of its argument that it did not abuse its broad discretion in finding that Wardell was a supervisor and attributing his conduct to the company. NLRB v. Kolpin Bros. Co., Inc., 7 Cir., 379 F.2d 488, 490; NLRB v. Elliott-Williams Co., Inc., 7 Cir., 345 F.2d 460, 463. Neither of these cases is of any benefit to the Board. In *Kolpin,* the Board found Joseph Nicholas to be a supervisor. Nicholas was a witness and testified that president Kolpin told him he was a supervisor, that he attended supervisors' meetings and that he was listed on the company bulletin board as being in charge of the shipping department. As already shown, the facts here are almost the opposite of those in that case. In *Elliott,* we approved the Board's finding that one Henry was a supervisor but pointed out that he had the authority to instruct, criticize and assign work to employees and that he was able effectively to recommend the hiring and firing of employees. This case is also distinguishable on its facts.

Of the numerous cases called to our attention, we cite and quote from NLRB v. Mt. Clemens Metal Products Co., 287 F.2d 790 (CA–6), and NLRB v. General Industries Electronics Co., 401 F.2d 297 (CA–8). In these cases the facts are similar to those here, and the reasoning of the court in each case is pertinent. In

*Mt. Clemens,* the court stated (287 F.2d page 791):

> "Under the circumstances in which the statements were made, we do not find justification for charging them to management or for holding that they represented the views of management. On the contrary, they appear to be isolated expressions of personal opinion on the part of minor supervisory employees, not repeated, and not authorized or approved by the job setters' superiors. [Citing cases.]"

In General Industries Electronics, the court stated (401 F.2d page 300):

> "The Supreme Court has laid down a two-fold test to be used in determining whether supervisory conduct constitutes interference: (1) are the words or deeds of the supervisory employee, taken in their setting, reasonably likely to restrain the employee's choice; (2) may it fairly be said that the employer is responsible for them? [Citing cases.]

> "We do not believe that the General Counsel has sustained the burden of proving either. The foreman had no responsibilities in the labor relations area. There is no showing that the Company, its officers or those concerned with industrial relations, either knew or ought to have known, that he would make a foray into the election campaign. Nor is there evidence indicating that he was encouraged, tacitly or otherwise, to do so."

See also Dayton Food Fair Stores, Inc. v. NLRB, 399 F.2d 153, 154 (CA–6), and NLRB v. Merchants Police, Inc., 313 F.2d 310, 312 (CA–7).

With one exception, hereinafter noted, both the examiner and the Board rely almost entirely upon the testimony of Dorothy Hanson, whom the examiner characterized as "not a completely reliable witness," and Sharon Hosch, an interested party, as subsequently shown. Both of these witnesses testified as to statements made by Wardell which were found to be discriminatory. In view of our holding as to the status occupied by Wardell, such statements are not chargeable to the company and need not be set forth; however, one bit of testimony is worth noting because it throws light on Wardell's motive. Hanson testified about the middle of March, Wardell and all of the woman employees had breakfast together, and that Wardell stated "that he had heard the union was trying to get in, and that he was going to have to try and find out who was working for it, because he wanted to get on the good side of whoever it was so he wouldn't get into any trouble with the union steward." If this statement means anything, it is that Wardell was speaking on his own behalf, not that of management, in an endeavor to protect his own interests in case the union succeeded.

There remains only a single finding by the trial examiner, approved by the Board, that respondent violated Section 8(a)(1) of the Act by interference, restraint or coercion. This violation is also relied upon by the Board in its finding that respondent discriminatorily discharged employee Willis Butcher in violation of Section 8(a)(3) of the Act, a violation subsequently discussed.

As stated in the Board's brief, about March 13, 1968, Caruk, personnel manager, approached employee Carol Erickson at her work station and inquired whether she was passing out union cards. She denied that she was engaged in such activity. Caruk then asked her whether she knew who was passing out the cards and she replied that it was Butcher. This statement is based on the uncorroborated testimony of Erickson. Caruk denied that he ever had such a conversation with her and that, at the time of Butcher's release, he did not know that Butcher was involved with the union in any way. Considering the record as a whole, and particularly the meticulous care which the company exercised in instructing its supervisory employees against making statements or engaging in conversations with employees, such as that related by Erickson, it is incredible that one of its important officials would do so. We reject the

Board's finding on this issue as being without substantial support.

A case much in point is our decision in Portable Electric Tools, Inc. v. NLRB, 7 Cir., 309 F.2d 423. In that case the general counsel relied on the uncorroborated testimony of Mrs. Ballard in support of its finding of a discriminatory discharge. Her testimony was denied by the company's personnel director. This court rejected the Board's finding, and in doing so stated (page 427):

"It hardly seems conceivable that an executive of his experience would make the blunder of admitting to Mrs. Ballard that she was being discharged for union activity, particularly in view of the other substantial reasons the company had for discharging her. The indulgence of such an assumption would cast serious reflection upon the intelligence and common sense of petitioner's personnel director. There is no occasion to do so in the absence of corroborating evidence which would tend to support Mrs. Ballard's version of the conversation."

The Board, with dubious propriety we think, relies upon statements contained in the speech made by Miller to the employees on May 2, 1968, which we have previously discussed, to bolster its finding of interference, restraint and coercion. As previously noted, this speech was thoroughly analyzed and discussed by the trial examiner and found to be lawful, which finding has been approved by the Board. The use of such statements, taken out of context, isolated and unconnected with the rest of the speech, is in our judgment without warrant and we accord no weight thereto.

■ This brings us to the issue raised by the Board's finding that the company discriminatorily discharged Butcher, in violation of Section 8(a) (3) of the Act. As already noted, the trial examiner found in favor of the company on this issue, which the Board with one member dissenting rejected. We hold that the Board's finding is not supported by substantial evidence; in fact, the finding of the trial examiner is supported by the overwhelming weight of the evidence.

We see no necessity of discussing this phase of the case in detail. Briefly, Butcher was employed in June 1967 and discharged March 14, 1968, by Knoth, plant manager, for the reason that he was either unable or unwilling to do the work which had been assigned him. About March 1, 1968, Butcher became interested in the possibilities of unionization, contacted the union and was given authorization cards for distribution in the plant. The only evidence upon which the Board relies to show that the company had knowledge of Butcher's union activity are statements made by Wardell, which we have held were not authorized by the company and were not binding on it, and the finding based upon the alleged statement made on March 13, 1968, by personnel manager Caruk to Erickson. This alleged conversation took place on the day before Butcher was discharged.

While we reject the finding of the Board on this issue, we agree with the trial examiner that the finding, if sustained, makes no difference in the ultimate result. The Board places much reliance on this finding as showing that the company acquired knowledge of Butcher's union activity on one day and discharged him on the next. We agree that under some circumstances it might be reasonably inferred that the discharge was because of a union activity but there is no basis for such an inference in this case where the evidence, as pointed out by the trial examiner, is overwhelmingly to the contrary.

There was much testimony by witnesses for management as well as fellow employees of Butcher that he was not able or willing to do the work assigned him. His fellow employees complained to management that his inefficiency interfered with their work. Managing officials talked with him at different times about the poor quality of his work and attempted without success to obtain improvement. More than that, a number of female witnesses testified as to Butcher's

gross misconduct toward them, about which they also had complained to management. He was cautioned about this conduct, but he did not change his ways.

The trial examiner found, "The record establishes the existence of adequate cause for Butcher's discharge. His performance as a setup man was unsatisfactory and he was informed of such fact at the end of each of his two review periods. In addition, he was warned on several occasions about his offensive behavior towards the female employees in the plant. Respondent's witnesses testified that there was no improvement on Butcher's part during the last 3 months of his employment and even Butcher did not attempt any serious contradiction of such testimony."

Samuel Neely, Butcher's foreman, testified that he made reports at different times to Knoth, relative to Butcher's work, and that he made a recommendation that Butcher be discharged. On the strength of this recommendation, Butcher was called into Knoth's office and in the presence of Neely was told that he was discharged because of his inability to do the work assigned him. Both Knoth and Neely testified that at that time they had no knowledge that Butcher was actively engaged in an attempt to unionize the plant. Knoth also testified that he made no attempt to transfer Butcher to another job as was the company's custom, because of the many complaints made by female employees as to his misconduct with them. Even if we assume the company had knowledge of Butcher's union activities, it still would be purely a matter of speculation that he was discharged for that reason. It defies all logic and common sense to find that Butcher was illegally discharged when the company had a solid legal basis to do so. More than that, Knoth's decision was not made on the spur of the moment. It had been under consideration for some time, and the recommendation had been made by Neely a week before.

■ Lastly, we consider the examiner's and Board's finding that the company violated Sec. 8(a) (1), (3) and (4) of the Act by discriminatorily rejecting Sharon Hosch's application for employment because the union had filed charges on her behalf. Hosch was employed by the company on two separate occasions— as a machine operater from February to March 1967, and as a "femco" operator on the third shift from February 1968 until the termination of her employment in April of that year. She took an active part in the abortive attempt to organize the union, of which the company was shown to have had knowledge.

On June 20, 1968, an unfair labor practice charge was filed by the union on her behalf. It was alleged that the company on or about April 26, 1968, constructively discharged her and thereafter refused to reinstate her.

The hearing before the trial examiner commenced September 18, 1968, and during the testimony of Hosch, general counsel obtained leave to amend the complaint by alleging that on September 16, 1968, the company refused to reinstate Hosch because of the unfair labor charge filed on her behalf and because she gave testimony to the Board in support of the unfair labor practice. By this amendment it was alleged, in addition to what had been alleged in the original complaint, that the company violated Sec. 8 (a) (4) of the Act.

On September 5, 1968, at the suggestion of the general counsel, Hosch wrote a letter to the company stating that she was "still" available for work in the machine shop on either the first or second shift. The company by letter dated September 16, 1968, responded to Hosch's letter. The Board relies upon these letters (subsequently set forth and discussed) as an application by Hosch for reinstatement and a refusal by the company to grant it. The Board found that this action by the company constituted a violation of Sec. 8(a) (4) of the Act, which makes it an unfair labor practice "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter."

The company contends that the Board's finding is not supported by substantial evidence and that there was no violation of the Act because Hosch had filed charges that she knew to be false and deliberately advanced such false contentions in support of her charges.

As previously noted, the company's third shift was eliminated on or about April 25, 1968. On that date general foreman Wayne Moore notified such employees that the shift was being discontinued and that the company intended to absorb the employees on the other two shifts. Moore interviewed the employees individually and was told by Hosch that she could not accept employment on the first or second shift and "would be looking for other employment." The trial examiner made a detailed analysis of Hosch's testimony as to conversations she had with Moore, personnel manager Caruk and his assistant, Olliges. We think it unnecessary to relate in detail the examiner's analysis of these various conversations. It is sufficient to note that he rejected the testimony of Hosch as to all of these conversations and specifically credited the testimony of Moore, Caruk and Olliges. At one point the examiner found:

"The operative facts are that Hosch was advised that her job on the third shift was being eliminated, that she was offered employment on either the first or second shift, and that she rejected such employment. In these circumstances, regardless of what she might have intended to do, she quit her employment."

The examiner, following his analysis of the evidence, found:

"Contrary to the contentions of General Counsel and the Charging Party I find that Hosch quit her employment on April 27 when the third shift was eliminated and that the circumstances do not spell out a constructive discharge."

The Board on brief asserts that Hosch was "initially laid off for economic reasons." We think this is an inaccurate statement. The facts as found by the trial examiner lead to the irrefutable premise that Hosch quit her employment of her own volition and thereby terminated her status as an employee of the company.

On September 5, 1968, about two weeks prior to the commencement of the hearing before the examiner, Hosch at the suggestion of the general counsel wrote Caruk, "I am still available for employment in the machine shop either first or second shift and would appreciate being called at the first opening that is available." Under date of September 16, 1968, Caruk replied. We regret to burden this opinion with such a lengthy letter, but we think it pertinent to do so for the reason that it speaks for itself. It follows:

"This letter is in reply to your letter dated September 5, 1968, informing us that you are still available for employment in the machine shop for either the first or second shift.

"As you are well aware, at the time we eliminated our 3rd shift operation on April 26, 1968, all 3rd shift employees including you, were offered available jobs on the 1st and 2nd shifts. Rather than take one of these positions you informed us that you could not work either of these shifts and chose to voluntarily quit the Company. You were at that time and until just recently eligible for rehire and had you notified us of your availability for work on the 1st or 2nd shift and applied for a job with us, you would have undoubtedly received favorable consideration.

"In the past few days, however, it has come to our attention, and your letter implies, that you contend that at the time of the 3rd shift elimination you made the request to several management officials to work on the 1st or 2nd shifts and your request was refused. You as well as Company officials know that you made no such request and that you voluntarily quit the Company.

"If such is now your contention we can only conclude that you are not truthful and trustworthy; therefore, not of the caliber or type of person we desire to have as an employee and would not be eligible for rehire by the Company.

"Since, however, we are not absolutely certain as to what your contention is about your quitting the Company, we must withhold decision on your employment eligibility until it can be determined.

"Please understand that our refusal to determine your employment eligibility at this time has nothing to do with you having filed a charge against the Company with the National Labor Relations Board. We respect your rights and the rights of all our employees to utilize any legal rights and remedies available to them.

"When we learned you had filed a charge with the National Labor Relations Board we were surprised but felt that perhaps you sincerely, although mistakenly, believed that the 3rd shift was eliminated to discriminate against you; or that you had some other reasonable but mistaken grounds for feeling you had been discriminated against. Apparently, however, such is not the situation. We, therefore, must withhold decision on your request until such time as your truthfulness and trustworthiness can be determined."

The examiner in his decision states:

"General Counsel and Charging Party contend that this letter in and of itself constitutes a violation of the Act because 'it is an attempt to punish a person for using Board processes although the pretext is that she is being punished for untruthfulness.' I agree."

The examiner continues:

"The letter advises Mrs. Hosch that she is not immediately eligible for employment with the Company because there now exists a question concerning her 'truthfulness and trustworthiness.' This question, according to the letter, (1) arose in the past few days, (2) because the Company believes she contends (3) that at the time the third shift was eliminated she asked several management officials for work on the first or second shift and was refused."

The examiner too soon forgot that previously in his decision, after hearing voluminous testimony by Hosch and three management officials, he repudiated her testimony and placed his stamp of approval upon that of the officials.

The examiner appears to have been much concerned as to where the company received its information that Hosch was not "truthful and trustworthy," as stated in its letter. In support of this theory he quotes at length answers to interrogatories made on September 11, 1968, in response to the company's request. These answers in substance allege that at the time the third shift was eliminated Hosch "requested to be transferred to an available job"; that she "requested to be transferred to the machine shop," that she made such requests to Caruk, Olliges and Moore, and that the company "constructively discharged" her. We assume that such answers were made by the general counsel from information furnished by Hosch. The trial examiner refused to credit the testimony of Hosch and found against the general counsel on each of the charges thus made.

In our view, it is not material, certainly not controlling, where or when the company obtained its information referred to in its letter. This is so even though we indulge in the speculative inference that it was obtained from the answers to interrogatories or the complaint filed by the Board. In any event, the information relied upon by the company was shown to be accurate by the findings of the trial examiner.

The examiner characterizes that portion of the letter disclaiming any connection between the action taken against Hosch and the instant proceeding as a self-serving statement on the part of the company. If the statement can be thus labeled, it is in the sense that it shows

knowledge on the part of the official who wrote the letter that it was a violation of the Act to refuse to rehire Hosch on the ground that she had filed with the Board a charge against the company. Under the circumstances of the case, a finding that the refusal was for that reason is devoid of all realism.

The Board on brief cites cases in support of the proposition that the employer has violated Sec. 8(a) (4) of the Act by refusing to hire a former employee because the employee has filed unfair labor practice charges against the employer, whether such charges be valid or invalid. Dubin-Haskell Lining Corp. v. NLRB, 386 F.2d 306 (CA-4); NLRB v. Whitfield Pickle Co., 374 F.2d 576, 582 (CA-5), and NLRB v. Syracuse Stamping Co., 208 F.2d 77, 79-80 (CA-2).

There are exceptions to this general rule, as the court recognized in *Dubin-Haskell*, 386 F.2d page 309:

"If an employer terminates or refuses employment because the employee has filed charges with, or testified before, the Board, the employer's action violates that section; but if an employer is motivated by lawful considerations, as, for example, the employee's poor work record, the employer's action is not prohibited. [Citing many cases.]"

The Board appears to recognize the exception to the general rule but fails to give it effect. It is stated by the Board, " * * * the Company contended that Hosch was denied employment, not simply because a charge was filed, but because of the content of the charge —namely, that the charge had knowingly and falsely accused Company officials of specific misconduct." The Board continues, "Of course, virtually every charge alleging a violation of Section 8(a) (3) of the Act accuses an employer of misconduct, but under the cases cited above, the determination that the charge was unsupported would not warrant the denial of further employment to the employee." We suppose that charges of an unfair labor practice accuse the employer of misconduct, but we also suppose that most charges are filed in good faith. But what happens if the charge is made

by one who knows it to be false? The Board continues, "Accordingly, the Company must establish that she 'deliberately falsified [her] testimony while on the stand at the hearing and in the unfair labor practice charge which [she] filed.'"

The Board then rehashes the conflicting testimony of Hosch and general foreman Moore as to the reasons for her discharge. Regarding this conflict the Board states, "This anomaly clearly justified the Trial Examiner's credibility determination as to whether she sought such a job, but it does not require a finding that Hosch was a deliberate perjurer, as the Company contends."

We are not aware of any instance where the company branded Hosch as a "deliberate perjurer." Neither did the trial examiner find in so many words that her testimony was deliberately falsified in an attempt to sustain the charge. What the examiner did was to reject her testimony as to numerous conversations which she had with three different company officials. In every instance, he credited the testimony of such officials and rejected that of Hosch. Such findings must have been made on the basis that he found her testimony to be false.

That the testimony of Hosch before the trial examiner was false is not open to question, and the conclusion is inescapable that it was given deliberately and with knowledge of its falsity.

A case much in point, where the factual situation is quite similar to that here, is Iowa Beef Packers, Inc. v. NLRB, 331 F.2d 176 (CA-8). In that case, the trial examiner found that employee Grove, whom the employer refused to rehire because he had given false testimony at the trial of an unfair labor practice case, should not be ordered reinstated or granted back pay on the ground that such an order would not effectuate the policies of the Act. The Board did not take issue with the trial examiner's decision that false statements knowingly made were a proper ground for denying reinstatement. Instead, the Board found that such statements were made as a result of the employee's misunderstand-

ing. (No such claim is made in the instant case.) The court rejected the finding of the Board and approved that of the examiner, and stated (page 185):

"The question concerning Grove and the 8(a) (4) violation is primarily one of credibility. After thorough examination of the record as a whole, we are convinced that the trial examiner's determination of this question was a valid one, and that the Board's conclusion that the incorrect portion of Grove's charge was a result of a misunderstanding is not supported by substantial evidence. The record further demonstrates that Grove gave false testimony at the hearing. Under these circumstances, forfeiture of Grove's remedy is required to serve the policy of the Act, and, consequently, the Board's order requiring Company to offer Grove immediate employment with back pay is not entitled to enforcement."

In NLRB v. Coca-Cola Bottling Co., 333 F.2d 181 (CA-7), this court considered a similar issue. While there was a difference in the factual situation, our reasoning is pertinent. We stated (page 185):

"Although physical misconduct is not present here, Dorman's misconduct exemplified by his pattern of falsification and deceit during his employment with the Company, climaxed by his false testimony at the hearing, surely disqualifies him from reinstatement or other employment rights. To force him upon the Company under such circumstances would bring about an impossible situation."

See also Dubin-Haskell Lining Corp. v. NLRB, 375 F.2d 568, 574 (CA-4).

We reject the Board's finding that the company discriminatorily denied Hosch's application for employment because the union had filed charges on her behalf.

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir., 1970, 431 F.2d 409, Part I.

A careful review of the record leads us to the firm conviction, and we so hold, that the Board's order is not supported by substantial evidence. The petition for enforcement is denied.